UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIE ROSE #235893,

    Plaintiff,

v.                                                  Case No. 2:16-cv-242
                                                    HON. GORDON J. QUIST

JOSEPH DAMRON, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by state prisoner Willie Rose pursuant to 42 U.S.C. § 1983. The Court screened the complaint pursuant to 28 U.S.C. §§ 1915, 1915A and 42 U.S.C. § 1997(e), and determined that Plaintiff's viable claims include: (1) Eighth Amendment claims against Defendants Damron, Covert, Bonefeld, Rogers, McDowell, Kinny, Paquette, and Canlas; (2) retaliation claims against Defendants Fretag, Covert, Rogers, and McDowell; and (3) Fourth Amendment claims against Defendants Rogers, McDowell, and Unknown Party #12. (ECF No. 43, PageID.978.) Defendants Rogers, Paquette, Canlas, and Bonefeld (the "Corizon Defendants") filed a motion for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies. (ECF No. 104.) Defendants Damron, Kinny, Freytag, and Covert (the "MDOC Defendants") filed a separate motion for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies. (ECF No. 135.) This matter is ready for decision.[1]

---

[1] The undersigned does not address Defendant Damron because the MDOC Defendants do not argue that Plaintiff failed to exhaust his claims against Defendant Damron.

In the screening opinion on August 31, 2017, the Court summarized Plaintiff's allegations in this case:

> In the early morning of November 22, 2015, Defendant Snider called health care and arranged for Plaintiff to be seen by Defendant Damron, who gave Plaintiff over the counter medication, but refused to provide any other care. Defendant Damron told Plaintiff that he believed Plaintiff had a virus and would be alright. At 9:00 a.m., Plaintiff told Defendant Snider that Defendant Damron had refused to give him treatment. Defendant Snider responded that there was no one else in health care and did nothing while Plaintiff suffered from severe pain, dizziness, vomiting, and chills. At 2:15 p.m. on the same date, Defendants Olsen and Baker called health care for Plaintiff, but were denied access by Defendant Damron. Defendant Damron asked them to put Plaintiff on the phone and told him that he was not going to be given treatment. Plaintiff stated that his condition had worsened and pleaded to be treated. Defendant Damron told Plaintiff that he was going home soon, but he would leave a note for the nurse to follow up with Plaintiff. When Plaintiff relayed this information to Defendants Olsen and Baker, they told him that they were sorry, but there was nothing more that they could do. Plaintiff states that the nurse, who was Unknown Party #5, never followed up with Plaintiff.
>
> Plaintiff attempted to take Tums and Tylenol, but became overwhelmed with extreme pain and dizziness and lost consciousness. When Plaintiff became conscious again, his roommate was asking him if he was ok. The roommate then went to get help. Plaintiff fell back into unconsciousness and when he became conscious again, Defendant Simmons was asking him questions. Plaintiff told Defendant Simmons that he was suffering from extreme back and stomach pain and pleaded for help. Defendant Simmons called health services for assistance, but Unknown Party #6 refused to respond because no health professionals were in the station. Defendant Simmons called again at 10:40 p.m., but there was still no health professional in the station. Defendant Unknown Party #7 then directed Defendant Simmons to bring Plaintiff to health services.
>
> Defendants Simmons and Vining complied, but dropped Plaintiff three times during the process. Once Plaintiff arrived at health services, he was required to wait for the arrival of Defendant Kinny who was in another facility. When Defendant Kinny arrived, Plaintiff explained his symptoms. Defendant Kinny asked how Plaintiff had gotten into the wheelchair, and Defendants Vining and

Unknown Party #8 stated that they had put Plaintiff in the chair. Defendants Kinny, Vining, and Unknown Party #8 then went into an adjacent room and began to argue. Defendant Kinny then asked Plaintiff if his back hurt, and Plaintiff stated that it did. After examining Plaintiff, Defendant Kinny called Defendant Paquette, who ordered that Plaintiff be taken to the hospital. Defendants Kinny, Vining, and Unknown Party #8 then began accusing Plaintiff of faking an illness and being drunk. Plaintiff was told that the state was going to charge him a big medical bill for the incident. Defendant Kinny then stated that she had to go and directed officers to prepare Plaintiff for transport. Defendant Kinny left Plaintiff with no medical professionals in attendance. Defendants Vining and Unknown Party #8 then pushed Plaintiff into the waiting room and left him there.

Defendant Paquette decided that corrections officials would transport Plaintiff to the hospital. Defendants Paquette, Kinny, and Unknown Parties #9 and #10 allowed Plaintiff to be taken to the hospital in a small squad car without any accompanying medical personnel. At 11:30 p.m., Defendant Unknown Party #12 performed a body search on Plaintiff by jerking his pants off while Plaintiff was in the wheelchair, causing Plaintiff extreme back pain. Defendant Unknown Party #12 then pushed Plaintiff outside to a small squad car, where Defendant Unknown Party #13 grabbed Plaintiff and put him in the back seat to be transported to the hospital without the assistance of any health care professional.

Plaintiff was taken to War Memorial Hospital, where he was diagnosed as having acute cholecystitis and was scheduled for immediate surgery. On November 23, 2015, the doctor advised Plaintiff of the gravity of his condition, which involved perforation of the gallbladder with fluid leakage and severe infection, and told Plaintiff that he wanted to operate as soon as Plaintiff's white blood cell count came down. Plaintiff had surgery on November 24, 2015. After the surgery, the doctor told Plaintiff that his gallbladder had been gangrenous and that the infection had spread to Plaintiff's liver, so the doctor had to remove part of Plaintiff's liver, as well as Plaintiff's gallbladder. The doctor explained that the liver involvement would have contributed to Plaintiff's severe pain and excessive bleeding. Because of the severity of Plaintiff's condition, he required intravenous antibiotics and an extended hospital stay. Plaintiff was sent to the Chippewa Correctional Facility (URF) on November 26, 2015, where he received follow-up care by URF nursing staff and was scheduled to see Defendant Canlas.

On November 30, 2015, Defendant Canlas saw Plaintiff for his post-op visit, but refused to address Plaintiff's severe back pain. Defendant Canlas stated that there had been no reports of breaks or fractures in Plaintiff's back and that Plaintiff should lose some weight. Defendant Canlas told Plaintiff that if he wanted to be seen for his back, he should kite. Plaintiff protested that he was in severe pain and that waiting for an appointment would be cruel. Plaintiff also complained that he could not afford the co-pay for the appointment. Defendant Canlas advised Plaintiff that he would not be charged a co-pay because the visit would be a follow-up to the November 22, 2015, medical emergency. Defendant Canlas then cancelled the visit. Plaintiff submitted a kite and was eventually charged a co-pay in violation of policy.

On December 17, 2015, Defendant Canlas saw Plaintiff for his back pain and refused to do anything but give him OTC Tylenol and tell him to lose weight. When Plaintiff complained about the co-pay, Defendant Canlas told him that he should not have been charged. During the appointment, Plaintiff asked about his medical records from November 22, 2015. Defendant Canlas told Plaintiff that the records were about six pages long and that they showed that Plaintiff had told Defendant Damron that he was suffering from serious gallbladder pain. Plaintiff went to the records office to ask for a copy of the November 22, 2015, medical records. However, when the records were provided, they were incomplete and consisted of only two pages. Plaintiff attempted to order the records again on April 29, 2016, but he was only given a cover sheet with no substantive information.

On December 1, 2015, Plaintiff asked Defendant Fretag for the names of all individuals who were involved with Plaintiff's treatment on November 22, 2015, but Defendant Fretag became verbally abusive and refused to give Plaintiff any information. On December 2, 2015, Plaintiff filed a grievance regarding the treatment he received from prison officials on November 22, 2015, as well as a grievance on Defendant Fretag for her failure to provide him with the names of parties involved in his treatment on November 22, 2015. However, the grievance was not filed by Defendant McLean until December 15, 2015, after Plaintiff's family called the prison to ask why Plaintiff's grievance had not been processed. During the interim period, Plaintiff was seen by health care on December 2, 7, and 9. At each appointment, Plaintiff was scheduled for a new follow-up appointment with a nurse.

Plaintiff wrote to Defendants Woods and LaPlaunt, advising them that he had been suffering from serious back pain and was being

denied treatment. Plaintiff did not receive a response from either Defendant Woods or Defendant LaPlaunt. On December 15, 2015, Plaintiff was seen by Social Worker Dreary for stress and depression. Mr. Dreary counseled Plaintiff and told him that he was scheduled to be called out to see health services twice the next day. On December 16, 2015, Plaintiff was seen by Defendant Covert, who told Plaintiff that he was causing problems for good people. Plaintiff said he was not there to talk about the grievance, but only to be treated. Plaintiff also told Defendant Covert that according to Defendant Canlas, he should not be charged a co-pay. Defendant Covert told Plaintiff that there was nothing wrong with him, and that he was going to be charged a co-pay every time he visited health services. Plaintiff told Defendant Covert that Defendant Damron had set up the appointment so that Plaintiff could be seen by the doctor if he had not already been seen, and could get an extension on the hot water bottle if necessary. In response, Defendant Covert took Plaintiff's hot water bottle. Defendant Covert also falsified Plaintiff's records by stating that his back injury was caused by a fall from his bunk and not related to the way he was treated for gallbladder problems on November 22, 2015. Defendant Covert then ripped up some papers from Plaintiff's medical chart and made him fill out a new kite. Plaintiff claims that Defendant Covert's treatment of Plaintiff was motivated by a desire to retaliate against him for writing the December 2, 2015, grievance and insinuated that Plaintiff was too comfortable at URF.

Shortly thereafter, Defendant Fretag stated that Defendants Covert and Damron had told her that Plaintiff was trying to get them in trouble, that it was not going to work because Plaintiff was a prisoner, and that Defendant Damron wanted Plaintiff to turn in his hot water bottle. Less than a week later, Plaintiff was transferred at the behest of Defendant Fretag, which caused the loss of Plaintiff's property and made it difficult for him to meet a court deadline. Plaintiff claims that this transfer was motivated by a desire to retaliate against Plaintiff for engaging in protected conduct.

. . .

On January 21, 2016, Defendant Bonefeld denied Plaintiff's request to treat him for back pain, stating that he was only going to see Plaintiff for his gallbladder problem, and that since Plaintiff was not having gallbladder issues, he should leave health care. Defendant Bonefeld falsely charted that Plaintiff had injured his back "while bending over." Plaintiff asserts that he was actually injured when he was transported to the hospital in a small squad car.

> . . .
>
> On May 24, 2016, Plaintiff was scheduled for an unnecessary appointment with Defendant Rogers by an Unknown Party. When Plaintiff arrived, Defendant Rogers asked why Plaintiff was there and Plaintiff responded that he did not know. Defendant Rogers then said that Plaintiff's EMG was finally approved and that it would be soon. Defendant Rogers asked Plaintiff if he was feeling any serious pain, and Plaintiff said that he was not, thanks to the Prednisone. Defendant Rogers said "good" and cancelled the visit. However, as Plaintiff was leaving, Defendant Rogers checked her computer and told Plaintiff to wait. Plaintiff believes that she had just received an email from other Defendants. Defendant Rogers told Plaintiff that she needed to examine him to set him up for his MRI. Plaintiff stated that he thought he was to have an EMG. Defendant Rogers told Plaintiff to "never mind that" and told Plaintiff to sit down. Defendant Rogers then unfolded a paper clip and poked Plaintiff in the toes, feet, and legs, and stated that Plaintiff had not felt the pokes. Plaintiff said, "I did," but Defendant Rogers smiled and said, "No, you didn't." Defendant Rogers asked Plaintiff if he had any incontinence and, when Plaintiff said that he did not, she stated, "Yes, you do." Defendant Rogers also noted that Plaintiff was having a lot of lower back pain, despite Plaintiff stating that his pain was minor. Defendant Rogers then had Plaintiff do some stretches and told him that she needed to do a rectal exam on Plaintiff. Plaintiff refused, and asked Defendant Rogers why she was doing this. Defendant Rogers stated, "You're writing all of these complaints and trying to hold us accountable for your back pain so I need to perform this rectum exam on you." Plaintiff continued to refuse the exam, so Defendant Rogers called in Defendant McDowell, who would not leave the room and told Plaintiff that he had to comply with the exam or he would be sent to segregation until he complied. Defendant McDowell also told Plaintiff that everyone was sick of Plaintiff's "crap" and he could write as many grievances as he wanted. Plaintiff finally complied, and Defendant Rogers assaulted Plaintiff by "sticking her fingers in his rectum." During the exam, Defendants Rogers and McDowell laughed at Plaintiff's situation.

(ECF No 43, PageID.954-962.)

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th

Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-216 (2007).  A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005).  A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).  The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show

the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S.Ct. 1850, 1859-1860 (2016).

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶¶ P, V. The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ V. The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief. *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process."). An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits. *See id*. at 325. We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court." *Id*. at 324.

*Mattox v. Edelman*, 2017 WL 992510, slip op. at 8-9 (6th Cir. 2017).[2]

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. *Id.* at ¶¶ T, BB. The respondent at Step II is designated by the policy, *e.g.*, the regional health administrator for a medical care grievances. *Id.* at ¶ DD. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ T, FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶¶ T, FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ GG. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved . . . ." *Id.* at ¶ S.

Before addressing Defendants' summary judgment motions, the undersigned will address Plaintiff's allegations that Defendants are impeding discovery and refusing to respond to his Rule 45 subpoena. Based on these allegations, Plaintiff seeks monetary sanctions. The undersigned finds that Plaintiff's allegations have no merit. The Court previously denied

---

[2] In *Holloway v. Mclaren*, No. 15-2184 (6th Cir., April 7, 2016) (unpublished), the Sixth Circuit concluded that where a plaintiff fails to name each defendant in his grievance, the un-named defendants may not be dismissed for failure to exhaust grievance remedies if the MDOC did not reject the grievance under the policy requiring a grievant to name each individual involved. The Sixth Circuit stated: "Because MDOC officials addressed the merits of Holloway's grievance at each step and did not enforce any procedural requirements, Holloway's failure to identify the defendants named in this lawsuit and to specify any wrongdoing by them in his grievances cannot provide the basis for dismissal of his complaint for lack of exhaustion." *Id*. at 3. In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints." slip op. at 16. For example, grieving a doctor about his failure to give cardiac catheterization failed to grieve the claim that the doctor erred by not prescribing Ranexa.

Plaintiff's motions related to his Rule 45 subpoenas. Although it appears that Plaintiff has sent additional Rule 45 subpoenas and discovery requests to Defendants, Plaintiff has already filed a response brief to both motions for summary judgments, (ECF Nos. 115 & 177), and never requested any time extensions. Moreover, Plaintiff included all of the relevant grievances as exhibits to his amended complaint and has thoroughly explained how prison officials impeded his ability to comply with the grievance procedure. Accordingly, the undersigned recommends that Plaintiff's request for monetary sanctions should be denied.

Plaintiff alleges that Defendant Kinny was deliberately indifferent on November 22, 2015, when he left Plaintiff without medical supervision before Plaintiff was transferred to the hospital. Defendant Kinny argues that Plaintiff failed to exhaust this claim because Plaintiff did not identify him in URF-15-12-4650-12e3, (ECF No. 135-3, PageID.2091-2099). Plaintiff argues that he exhausted his claims against Defendant Kinny in three different grievances, URF-15-12-4650-12e3, URF-16-04-1619-28A[3] (ECF No. 135-3, PageID.2057-2067), and URF-16-01-320-17z[4] (ECF No. 135-3, PageID.2072-2079). In URF-16-04-1619-28A, Plaintiff identified Defendant Kinny and complained of his conduct on November 22, 2015. (PageID.2060.) This grievance was rejected at Step I as being duplicative because "issues brought up in this grievance were addressed in URF 15 12 4650 12e3 and URF 16 01 320 17z." (PageID.2062.) Thus, the MDOC essentially conceded that the issues in URF-16-04-1619-28A were already addressed in Plaintiff's prior grievances. Plaintiff appealed this grievance to Step III, where it was rejected for being untimely. However, Plaintiff alleges that MDOC officials refused to process his grievances in a timely manner. Plaintiff's argument is supported by the fact that he handwrote his Step II and

---

[3] Grievance URF-16-04-1619-28A was changed to URF-16-04-1619-28e at Step III.
[4] Grievance URF-16-01-320-17z was changed to URF-16-01-320-28e at Step III.

-11-

Step III appeal. (PageID.2063-2064.) In addition, at Step II in URF-15-12-4650-12e3, Plaintiff complained that he was left with non-medical professionals on November 22, 2015. (PageID.2098.) This grievance was never rejected for failing to name Defendant Kinny. In the opinion of the undersigned, Plaintiff's grievances gave the prison staff a fair chance to remedy his complaints against Defendant Kinny. Therefore, Defendant Kinny has failed to meet his burden to show that Plaintiff did not exhaust his available administrative remedies.

Plaintiff alleges that Defendant Paquette was deliberately indifferent on November 22, 2015, when he allowed non-medical professionals to transport Plaintiff to the hospital. Defendant Paquette argues that Plaintiff failed to exhaust the claim against him because URF-16-04-1619-28e was rejected as untimely at Step III. Plaintiff responds that he exhausted his claim against Defendant Paquette in URF-15-12-4650-12e3 and URF 16-01-320-17z. At Step II of URF-15-12-4650-12e3, Plaintiff wrote: "Why did health care Danielle M. Paquette PA send grievant out by car when grievant was not able to stand on his own?" (ECF No. 104-1, PageID.1567.) The Step II grievance was never rejected. Instead, the Step II response specifically addressed Plaintiff's claim "that an inappropriate mode of transport (car) was used to transport him off-site that day." (PageID.1563.) Plaintiff appealed this grievance through Step III, and the MDOC never enforced any procedural rule barring Plaintiff's complaint against Defendant Paquette. Therefore, in the opinion of the undersigned, Defendant Paquette has failed to meet his burden to show that Plaintiff did not exhaust his available administrative remedies.

Plaintiff asserts Eighth Amendment and retaliation claims against Defendant Covert stemming from the charging of a co-pay and taking Plaintiff's hot water bottle during an examination on December 16, 2015. Similar to Defendant Kinny, Defendant Covert argues that Plaintiff failed to exhaust the claims against him because Plaintiff did not identify him in URF-15-

-12-

12-4650-12e3, (ECF No. 135-3, PageID.2091-2099).  This grievance does not appear to be relevant to the claims against Defendant Covert.  Defendant Covert also argues that the only grievance raising the issue of retaliation, URF-16-02-0487-28e (ECF No. 135-3, PageID.2080-2090), did not identify him and was rejected as untimely. Contrary to Defendant Covert's assertion, Plaintiff appears to name Defendant Covert in URF-16-02-0487-28e as "nurse Supervisor Mr. Coventry." (PageID.2085.)  In this grievance, Plaintiff grieved that Plaintiff took his water bottle on December 16, 2015.  However, this grievance was rejected as untimely.  Plaintiff fails to offer any valid reason for why he did not file this grievance against Defendant Covert until January 26, 2016.  Unlike Defendant Freytag, which the undersigned addresses below, Plaintiff knew Defendant Covert took his water bottle on December 16, 2015. Therefore, in the opinion of the undersigned, Plaintiff failed to exhaust his administrative remedies on his claims against Defendant Covert related to the hot water bottle.

Plaintiff also argues that he exhausted his claims against Defendant Covert in KCF-15-12-1690-12z, (ECF No. 26-8, PageID.617-637), which neither Defendants included in their motions for summary judgment.  In this grievance, Plaintiff complained about being charged co-pays.  Plaintiff appealed this grievance through Step III.  Therefore, in the opinion of the undersigned, Plaintiff exhausted his claims against Defendant Covert based on the charging of co-pays.

Plaintiff alleges that Defendant Freytag transferred Plaintiff to a different prison on December 21, 2015, in retaliation for exercising his protected conduct.  Defendant Freytag argues that Plaintiff failed to exhaust this claim because URF-16-02-487-28e, (ECF No. 135-3, PageID.2080-2090), was rejected as untimely.  Plaintiff appealed this grievance through Step III. (PageID.2080-2089.)  It is true that this grievance was filed over one month after the transfer

occurred. However, Plaintiff argues that he was unable to file the grievance because he did not know who orchestrated the transfer until he received his transfer paperwork on January 26, 2016. Once he learned that Defendant Freytag was behind the transfer, Plaintiff filed the grievance. MDOC Policy Directive 03.02.130(P) suggests that the grievance timing deadlines start when the inmate "becom[es] aware of a grievable issue." (ECF No. 135-2, PageID.2024.) MDOC Policy Directive 03.02.130(G)(3) provides that a "grievance shall not be rejected if there is a valid reason for the delay; e.g., transfer." (ECF No. 135-2, PageID.2023). In the opinion of the undersigned, a reasonable jury could find that this grievance against Defendant Freytag should not have been rejected as untimely.

Plaintiff alleges that Defendant Canlas was deliberately indifferent to his serious back pain when he failed to treat him on November 30, 2015, and December 17, 2015. Defendant Canlas argues that Plaintiff failed to exhaust this claim because KCF-16-05-0750-28C, (ECF No. 104-1, PageID.1431), was rejected as untimely. As Plaintiff points out, this grievance does not appear to address any of the November 30 or December 17 allegations against Defendant Canlas. However, Plaintiff appears to have addressed the November 30 and December 17 allegations against Defendant Canlas in KCF-16-01-113-12d1. (ECF No. 26-12, PageID.670-684.) Plaintiff appealed this grievance through Step III. Therefore, in the opinion of the undersigned, Defendant Canlas has failed to meet his burden to show that Plaintiff did not exhaust his available administrative remedies related to events that occurred on November 30 and December 17.

Plaintiff alleges that Defendant Bonefeld was deliberately indifferent to his serious back pain when he failed to treat Plaintiff on January 21, 2016. Defendant Bonefeld argues that Plaintiff failed to exhaust this claim because KCF-16-05-0733-28E, (ECF No. 104-1, PageID.1412), was rejected as untimely. Again, this grievance does not appear to be relevant

because it addresses events that occurred in April 2016. Plaintiff attempts to show that he exhausted the claim arising from January 21, 2016 by citing "KCF-16-01-165-12 – Ex. G of the Amended Complaint." (ECF No. 116, PageID.1824.) Exhibit G of the Amended complaint is Grievance KCF-16-02-165-12z, (ECF No. 26-13), which concerns Plaintiff's complaints about being charged a co-pay. Plaintiff does not dispute that he never named Defendant Bonefeld in this grievance. Plaintiff also never identified the date of the evaluation, January 21, 2016, anywhere in this grievance. Instead, Plaintiff identified the "Date of the Incident" as January 15, 2016 and January 25, 2016. Nor did Plaintiff allege any facts regarding any evaluation by Defendant Bonefeld. Therefore, in the opinion of the undersigned, Plaintiff did not exhaust his available administrative remedies on his claim against Defendant Bonefeld.

      Finally, Plaintiff asserts Fourth Amendment, Eighth Amendment, and retaliation claims against Defendant Rogers stemming from events that occurred on May 24, 2016. Defendant Rogers argues that Plaintiff failed to exhaust his administrative remedies because KCF-16-06-0788-28F, (ECF No. 104-1, PageID.1418-1421), was rejected as Plaintiff was on "Modified Access status." Plaintiff states that this grievance was improperly rejected because he was not on "Modified Access status" at this time. Moreover, Plaintiff states that he filed another grievance on this issue, KCF-16-05-775-17B. Neither Defendants attached a copy of this grievance to their motions for summary judgment. However, Plaintiff has previously filed a copy of the Step I and Step II grievances with the Court. (ECF No. 45, PageID.987-990.) It is unclear from the record whether this grievance was denied or rejected. The Step I response appears to be a denial, but the Step II response states that the Step I "rejection is upheld." Although Plaintiff did not submit a copy of his Step III appeal, his "MDOC Prisoner Step III Grievance Report" shows that Plaintiff filed a Step III appeal. (ECF No. 104-1, PageID.1319.) Moreover, the report states that KCF-16-

05-775-17B was denied and not rejected. Therefore, in the opinion of the undersigned, Defendant Rogers has failed to meet his burden to show that Plaintiff did not exhaust his available administrative remedies.

Accordingly, the undersigned recommends that the Corizon Defendants' motion for summary judgment (ECF No 104) be GRANTED as to the claims against Defendant Bonefeld and DENIED as to the claims against Defendants Rogers, Paquette, and Canlas. Therefore, Defendant Bonefeld should be dismissed from this case.

It is further recommended that the MDOC Defendants' motion for summary judgment (ECF No. 135) be GRANTED as to the claims related to the hot water bottle against Defendant Covert and DENIED as to the claims against Defendants Damron, Kinny, and Freytag.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:  March 20, 2018

     /s/ Timothy P. Greeley  
TIMOTHY P. GREELEY  
UNITED STATES MAGISTRATE JUDGE