UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIE ROSE #235893,

        Plaintiff,

v.                                 Case No. 2:16-cv-242
                                 HON.  GORDON J. QUIST

JOSEPH DAMRON, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by state prisoner Willie Rose pursuant to 42 U.S.C. § 1983.  Plaintiff asserts First, Fourth, and Eighth Amendment claims against Defendants Bienvenido Canlas, Danielle Paquette, Penny Rogers, Gerald Covert, Joseph Damron, Rebecca Freytag, Elizabeth Kinney, and Michael McDowell.  Defendants Canlas, Paquette, and Rogers (the "Corizon Defendants") filed a motion for summary judgment.  (ECF No. 291.)  Plaintiff filed a response. (ECF No. 319.) Defendants Covert, Damron, Freytag, Kinney, and McDowell (the "MDOC Defendants") filed a separate motion for summary judgment and assert that they are entitled to qualified immunity. (ECF No. 361.) Plaintiff filed a response. (ECF No. 368.) This matter is ready for decision.

The claims in this case arise from a series of events that occurred at the Chippewa Correctional Facility (URF) and the Kinross Correctional Facility (KCF). On November 20, 2015, Plaintiff began to feel noxious and had pain in his stomach. At about 8:00 a.m. on November 22, 2015, Plaintiff was examined by Defendant Damron, RN. Plaintiff reported that he vomited several times over the past couple days. Plaintiff also claims that he told Defendant Damron that he had a family history of gallbladder problems. Defendant Damron checked Plaintiff's vitals and noted

that Plaintiff's abdomen was a little tender, but no masses were found. Following the examination, Defendant Damron gave Plaintiff over the counter medication including antacid tabs, Tylenol, and Mylanta. Defendant Damron also instructed Plaintiff to rest, avoid eating spicy food, drink water, and notify healthcare if his symptoms increased.

At about 2:15 p.m. on the same date, Plaintiff again requested medical care because his symptoms were getting worse. According to Plaintiff, Defendant Damron refused to see him in person for a second time. Instead, Defendant Damron spoke to Plaintiff by phone. During this phone conversation, Plaintiff explained that his condition had worsened. Defendant Damron told Plaintiff that he was going home soon but that he would leave a note for the next nurse to follow up with Plaintiff.

Over the next several hours, Plaintiff's condition continued to worsen. He states that he lost consciousness and fell out his bunk, injuring his back. At about 11:00 p.m., Plaintiff was returned to health care by wheelchair and examined by Defendant Kinney, RN.  After taking Plaintiff's vitals, Defendant Kinney called Defendant Paquette, NP. Defendant Paquette ordered Plaintiff to be transferred to War Memorial Hospital by security transport for further evaluation and treatment.  Plaintiff was then placed back in a wheelchair and left alone for twenty to thirty minutes before the security transport arrived. Plaintiff was subsequently transferred to the hospital by two untrained medical professionals.

When Plaintiff arrived at War Memorial Hospital, he was diagnosed with having acute cholecystitis.  The doctor advised Plaintiff that he would have surgery as soon as his white blood cell count came down. On November 24, 2015, Plaintiff had a successful laparoscopic cholecystectomy to remove his gallbladder. After the surgery, the doctor told Plaintiff that his gallbladder had been gangrenous and that the infection had spread to his liver. Plaintiff was also

prescribed Cipro and Flagyl. In addition, while at the hospital, Plaintiff had an x-ray on his back because he continued to complain of pain from falling on November 22, 2015. The results showed that Plaintiff had mild levoscoliosis but no fractures or any other abnormalities. Plaintiff returned to URF on November 26, 2015.

On November 30, 2015, Defendant Canlas saw Plaintiff for his post-op visit. At this appointment, Plaintiff again complained of pain in his lower back. After reviewing Plaintiff's file, Defendant Canlas told Plaintiff that he did not have any breaks or fractures in his back. Defendant Canlas suggested that Plaintiff should lose some weight. Defendant Canlas also told Plaintiff that if he wanted to be seen for his back, he should kite to set up an appointment. Plaintiff sent a kite later that day. On December 2, 2015, Defendant Damron examined Plaintiff for his back pain. Prior to this appointment, Plaintiff had a bottom bunk and was provided Tylenol for pain management.  Following a consult with Defendant Canlas, Defendant Damron ordered Phenergan for nausea, a bottom bunk detail for two weeks, and Tylenol. Defendant Damron also gave Plaintiff instructions for several stretching exercises that could help reduce his back pain.  Plaintiff continued to complain of back pain and was seen by a medical provider on December 7, 2015, and December 16, 2015. On December 17, 2015, Defendant Canlas saw Plaintiff again for his back pain.  Defendant Canlas again gave Plaintiff Tylenol and extended his temporary bottom bunk detail. Defendant Canlas also instructed Plaintiff to avoid lifting weights, yard activity, and back bending.

On December 1, 2015, Plaintiff asked Defendant Freytag for the names of all individuals who were involved with Plaintiff's treatment on November 22, 2015. Defendant Freytag refused to provide any names. Plaintiff eventually filed a grievance against Defendant Freytag for her failure to provide him with the names. On December 16, 2015, Plaintiff was seen

by Defendant Covert, who told Plaintiff that he was causing problems for good people. Plaintiff said he was not there to talk about the grievance, but only to be treated. Plaintiff also told Defendant Covert that according to Defendant Canlas, he should not be charged a co-pay. Defendant Covert told Plaintiff that there was nothing wrong with him, and that he was going to be charged a co-pay every time he visited health services. Defendant Covert then ripped up some papers from Plaintiff's medical chart and made him fill out a new kite. Plaintiff claims that Defendant Covert's treatment of Plaintiff was motivated by a desire to retaliate against him for writing the December 2, 2015, grievance and insinuated that Plaintiff was too comfortable at URF. Shortly thereafter, Defendant Freytag stated that Defendants Covert and Damron had told her that Plaintiff was trying to get them in trouble and that it was not going to work. Less than a week later, Plaintiff was transferred to KCF, which caused the loss of Plaintiff's property and made him miss a court deadline. Plaintiff claims that this transfer was motivated by a desire to retaliate against Plaintiff for engaging in protected conduct.

On May 24, 2016, Plaintiff visited health care and was seen by Defendant Rogers, NP. Plaintiff states that Defendant Rogers told him that his request for an EMG was finally approved. Defendant Rogers asked Plaintiff if he was feeling any serious pain, and Plaintiff responded that he was not because the recently prescribed Prednisone was effective. As Plaintiff was leaving, however, Defendant Rogers checked her computer and told Plaintiff to wait. Defendant Rogers then told Plaintiff that she needed to examine him to set up an MRI. Defendant Rogers proceeded to poke Plaintiff with a paper clip in the toes, feet, and legs.  When Plaintiff said that he could feel the poking, Defendant Rogers smiled and said, "No, you didn't." Defendant Rogers subsequently asked Plaintiff if he had any incontinence and, when Plaintiff said that he did not, she stated, "Yes, you do." Defendant Rogers then told Plaintiff that she needed to do a rectal

-4-

exam on Plaintiff. Plaintiff refused and asked Defendant Rogers why she was doing this. Defendant Rogers replied, "You're writing all of these complaints and trying to hold us accountable for your back pain so I need to perform this rectum exam on you." Plaintiff again refused the exam, thus, Defendant Rogers called Defendant McDowell into the exam room. Defendant McDowell told Plaintiff that he had to comply with the exam or he would be sent to segregation until he complied. Defendant McDowell also said that everyone was sick of Plaintiff's "crap" and he could write as many grievances as he wanted. Plaintiff finally complied, and Defendant Rogers conducted a rectal exam on Plaintiff.

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. Ultimately, the court must determine whether there is sufficient

"evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones*, Inc., 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); cf. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

The MDOC Defendants assert that they are entitled to qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In making a qualified immunity determination, the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 232. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id.*

Plaintiff first asserts several Eighth Amendment claims stemming from the medical care he received at URF. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). A prisoner's Eighth Amendment rights are violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received

inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; s*ee also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006).  However, if a prisoner received "grossly inadequate care" accompanying "a decision to take an easier but less efficacious course of treatment," however, this may amount to deliberate indifference. *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). In order to be considered "grossly inadequate care," the medical treatment must have been "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Plaintiff alleges that Defendant Damron was deliberately indifferent to his serious medical needs when he provided inadequate medical treatment on November 22, 2015. Defendant Damron first examined Plaintiff at about 8:00 a.m. During this examination, Plaintiff reported that he vomited several times over the past couple days and that he had a family history of gallbladder problems. Defendant Damron gave Plaintiff over the counter medication including antacid tabs, Tylenol, and Mylanta and instructed Plaintiff to rest, avoid eating spicy food, drink water, and notify healthcare if his symptoms increased.  At about 2:15 p.m., Plaintiff notified medical care because his symptoms were getting worse. However, Defendant Damron refused to see him and, instead, told Plaintiff that he he would leave a note for the next nurse to follow up with Plaintiff. Because of Defendant Damron's refusal to treat him, Plaintiff suffered for several hours while his condition worsened.

Defendant Damron argues that Plaintiff is simply disputing the adequacy of his treatment. Defendant Damron further states that "[a]t best, Rose has shown that Damron misdiagnosed Rose's injuries."   However, accepting Plaintiff's version of events as true, Defendant Damron was aware that Plaintiff had been throwing up for two days, that he was in pain, and that he had a history of gallbladder issues. Despite knowing these symptoms, Defendant Damron refused to see Plaintiff a second time on November 22, 2015. The undersigned finds a question of fact exists regarding whether Defendant Damron's treatment of Plaintiff—specifically refusing to see Plaintiff when the condition worsened a second time because he was supposed to go home soon—was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Terrance*, 286 F.3d at 844. Therefore, in the opinion of the undersigned, Defendant Damron has failed to show that he is entitled to summary judgment on Plaintiff's deliberate indifference claim.

In addition, Defendant Damron argues that he is entitled to qualified immunity. Thus, the undersigned must determine if the law was clearly established at the time. "Eighth Amendment jurisprudence clearly establishes that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain that is violative of the Constitution." *Darrah v. Krisher*, 865 F.3d 361, 367 (6th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 105 (1976)) (internal quotation marks omitted). Moreover, "'[t]he proposition that deliberate indifference to a prisoner's medical needs can amount to a constitutional violation has been well-settled since *Estelle* in 1976.'" *Id.* (quoting *Parsons v. Caruso*, 491 F. App'x. 597, 602 (6th Cir. 2012)). In the opinion of the undersigned, because a question of fact exists regarding Plaintiff's Eighth Amendment claim against Defendant Damron, Defendant Damron is not entitled to qualified immunity.

Plaintiff alleges that Defendant Kinney was deliberately indifferent to his serious medical needs when he left Plaintiff without medical supervision for twenty to thirty minutes before Plaintiff was transferred to War Memorial Hospital.  Defendant Kinney argues that Plaintiff cannot maintain an Eighth Amendment claim because he did not suffer any physical injury from being left alone. It is unclear what precise role Defendant Kinney had in leaving Plaintiff unattended before being transferred to the hospital. The record establishes that Defendant Kinney examined Plaintiff and then called Defendant Paquette, who ordered Plaintiff to be transported to hospital by a private car transfer.  After Defendant Kinney told Plaintiff that he was going to be taken to the hospital, two corrections officers moved Plaintiff to a "holding" "health care station" across the hall. (ECF No. 362-2, PageID.3936.)  The officers then left the room and Plaintiff waited by himself for the private car transfer.  In the opinion of the undersigned, Plaintiff has failed to show that Defendant Kinney was deliberately indifferent to his serious medical needs.

Plaintiff alleges that Defendant Paquette was deliberately indifferent when she did not call an ambulance and allowed non-medical professionals to transport Plaintiff to the hospital. Defendant Paquette argues that Plaintiff cannot meet the subjective component of the deliberate indifference test. Defendant Paquette is a physician assistant. In her affidavit, she states that "EMS or medical professionals need to be present only if the patient requires medical interventions such as monitors (e.g., EKG for chest pain), IV medications, oxygen, etc." (ECF No. 291-2, PageID.3171.) On the night in question, Defendant Paquette received a report that Plaintiff was experiencing stomach pain, back pain, and leg numbness. Based on this report, Defendant Paquette made the decision that Plaintiff could be transported to the hospital by a private car transfer and that an ambulance was not medically necessary.  In the opinion of the undersigned, Plaintiff has

not shown that Defendant Paquette had a sufficiently culpable state of mind. At most, Plaintiff has alleged a medical malpractice claim against Defendant Paquette.

Plaintiff alleges that Defendant Canlas was deliberately indifferent when he failed to treat Plaintiff for his back pain on November 30, 2015, and December 17, 2015.  Defendant Canlas argues that Plaintiff has failed to meet both prongs of the deliberate indifference test. With respect to the objective prong, the question is whether Plaintiff's back pain constitutes a serious medical need.  Assuming—without deciding—that Plaintiff's back pain meets the objective prong, the undersigned finds that the subjective prong has not been met.  The medical records indicate that Plaintiff began complaining of back pain after he fell on November 22, 2015.  After he was transported to War Memorial Hospital for his acute cholecystitis, Plaintiff apparently complained of back pain. He subsequently had an x-ray on his lumbar spine, which revealed "mild levoscoliosis" but "[n]o acute process." (ECF No. 293-1, PageID.3256.) The War Memorial Hospital physicians did not recommend any treatment for Plaintiff's mild back injury. When Plaintiff returned to URF, Defendant Canlas saw Plaintiff for a follow-up appointment after his surgery. The medical records indicate that Plaintiff never complained about his back pain at this appointment. Plaintiff states that he did complain about his back pain and that Defendant Canlas told him to kite his complaints. But even if Plaintiff complained of back pain at this appointment, Plaintiff did not have an urgent medical condition that required treatment.  Medical providers addressed Plaintiff's back pain at appointments on December 2, December 7, December 16, and December 17.  Further, Plaintiff's treatment plan demonstrates there was no real emergency to treat Plaintiff's mild back pain. He only received Tylenol, a bottom bunk detail, and instructions to avoid lifting weights, yard activity and back bending. Notably, Plaintiff was already taking Tylenol and had a bottom bunk before the first time he met with Defendant Canlas. In the opinion

of the undersigned, Plaintiff has failed to show that Defendant Canlas was deliberately indifferent to his back pain.

Plaintiff next alleges that Defendants Freytag and Covert transferred him to a different prison in retaliation for filing grievances.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant."  *Id.* at 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).  "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment."  *Id.*

Defendants Freytag and Covert argue that the transfer does not constitute an adverse action.  "[A]n adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake."  *Thaddeus–X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).  The Sixth Circuit has stated that "[s]ince transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct."  *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005) (citing *Smith v. Yarrow*, 78 F. App'x. 529, 543-44 (6th Cir. 2003)).  But a limited exception applies when there are foreseeable consequences to the transfer that interfere with the prisoner's ability to access the courts. *Id.* at 702.  "Only those consequences that inextricably follow from a defendant's alleged

retaliatory conduct (a transfer from filling out a transfer screen, for instance) would be considered in determining whether the plaintiff suffered an adverse action." *Id.*

In this case, Plaintiff was transferred from URF to KCF. Although the two prisons are close to each other, they are separate prison facilities.  Defendants Freytag and Covert correctly state that the transfer did not (1) cause Plaintiff to lose his job, (2) impact Plaintiff's ability to see his family; or (3) interfere with Plaintiff's ability to speak with his attorney. However, Plaintiff claims that he lost over 100 pages of legal documents because of the transfer. Plaintiff further states that he needed this material to appeal his state court conviction. Defendants Freytag and Covert fail to address the loss of legal documents in their argument section.  In the opinion of the undersigned, Defendants Freytag and Covert have not met their burden to show that the transfer did not constitute an adverse act.

Defendants Freytag and Covert also argue that they are entitled to qualified immunity because "the law was not clearly established in 2015 that a transfer from housing unit within the same prison could be an adverse action when it had no impact on a prisoner's ability to access the courts." (ECF No. 362, PageID.3921.)  However, Plaintiff was transferred to a different prison and the loss of legal documents may have interfered with Plaintiff's ability to access the courts.  Therefore, in the opinion of the undersigned, Defendants Freytag and Covert are not entitled to qualified immunity.

Plaintiff finally asserts First, Fourth, and Eighth Amendment claims against Defendants Rogers and McDowell based on the May 24, 2016 rectal exam.  The parties dispute what occurred during the May 24, 2016 examination. Defendants state that the rectal exam was a necessary medical procedure based on Plaintiff's symptoms.  Defendants' version of events is supported by Defendant Roger's affidavit and the medical records.  On the other hand, Plaintiff

states that the rectal exam was unnecessary and conducted in retaliation for filing grievances. Plaintiff further states that Defendant Rogers falsified the medical records and that he never reported having any issues related to incontinence. Plaintiff also states that Defendant McDowell threatened him with segregation if he did not consent to the rectal exam.

The record establishes that the parties dispute whether the rectal exam was for a medical purpose. The majority of Defendants' arguments demonstrates that this is a significant factual dispute. For example, Defendant Rogers argues that Plaintiff's First Amendment claim fails because the adverse act "was really a proper medical exam." (ECF No. 291, PageID.3166.) But Plaintiff contends that the rectal exam was not a proper medical exam. Similarly, Defendants argue that Plaintiff's Fourth Amendment claim fails "because an examination by a medical provider for medical purposes is not a search and seizure." (ECF No. 329, PageID.3684.) Again, Plaintiff states that this examination was not done for a medical purpose. In addition, Defendant Rogers argues that Plaintiff's Eighth Amendment claim fails because Plaintiff does not allege that Defendant Rogers was deliberately indifferent to Plaintiff's serious medical needs. However, as Plaintiff has made clear, this claim is an excessive-force Eighth Amendment claim; therefore, Plaintiff does not need to show that Defendant Rogers was deliberately indifferent to a *serious medical need*.

Defendant McDowell argues that the claims against him should be dismissed because he never physically touched Plaintiff.  Plaintiff does not dispute that Defendant McDowell never touched him. Instead, Plaintiff claims that Defendant McDowell threatened him with segregation unless he allowed Defendant Rogers to conduct the rectal exam. In the opinion of the undersigned, Defendant McDowell's personal involvement in the incident is sufficient.

Defendant Rogers argues that she was not aware of any grievances filed by Plaintiff. However, Plaintiff explains that Defendant Rogers was aware of one of Plaintiff's grievances because of her involvement with Plaintiff's medical care. Plaintiff explains that Defendant Rogers was responsible for changing one of Plaintiff's medical prescriptions on May 9, 2016. Plaintiff's argument is confusing and hard to follow. In addition, the grievance was apparently rejected and, according to MDOC Policy, the MDOC does not conduct investigations into grievances that are rejected. See MDOC Policy Directive 03.02.130 (effective 7/9/2007) at ¶¶ X and AA. Nonetheless, Plaintiff claims that Defendant Rogers said, "[y]ou're writing all of these complaints and trying to hold us accountable for your back pain so I need to perform this rectum exam on you." Thus, the undersigned finds that a question of fact exists as to whether Defendant Rogers knew about Plaintiff's grievances.

Finally, Defendant McDowell argues that he is entitled to qualified immunity. However, as discussed above, there are factual disputes as to the purpose of the rectal exam and Defendant McDowell's role. Defendant McDowell's qualified immunity defense turns on these factual determinations. At this point, the undersigned cannot determine whether Defendant McDowell violated Plaintiff's clearly established rights. *See Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011) ("[I]f genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper."). Therefore, in the opinion of the undersigned, Defendant McDowell is not entitled to qualified immunity.

Accordingly, the undersigned recommends that the Corizon Defendants' motion for summary judgment (ECF No. 291) be GRANTED as to Defendants Paquette and Canlas and DENIED as to Defendant Rogers. It is further recommended that the MDOC Defendants' motion for summary judgment (ECF No. 361) be GRANTED as to Defendant Kinney and DENIED as to

Defendants Damron, Covert, Freytag, and Rogers. Therefore, Defendants Paquette, Canlas, and Kinney should be dismissed from this case.

        NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: February 26, 2019

           /s/ Timothy P. Greeley
          TIMOTHY P. GREELEY
          UNITED STATES MAGISTRATE JUDGE